No. 41,570

MATTIE WEAVER, *Appellant,* v. T. C. LAUNDON and W. E. LAUNDON, Co-Partners d/b/a The Copes, *Appellees.*

(352 P. 2d 412)

Opinion filed May 14, 1960.

*Raymond Briman,* of Topeka, argued the cause, and *Lester M. Goodell, Margaret McGurnaghan, Marlin S. Casey, Thomas R. Sewell, Gerald L. Goodell, Charles Rooney, Sr.,* and *Charles Rooney, Jr.,* all of Topeka, were with him on the brief for the appellant.

*Harold E. Doherty,* of Topeka, argued the cause, and *James E. Benfer* and *William B. McElhenny,* both of Topeka, were with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action for damages for personal injuries sustained by the plaintiff when she slipped and fell to the floor in the defendants' business premises. Appeal has been perfected to this court from an order of the trial court sustaining a demurrer to the plaintiff's evidence.

The questions presented are whether, at the time the plaintiff's (appellant's) fall to the floor of the defendants' (appellees') business premises, there was any evidence from which a jury could find that (1) the plaintiff was a business invitee; (2) the defendants were guilty of any act or acts of negligence; and (3) the plaintiff was free from contributory negligence.

On the 23rd day of November, 1955, at approximately 10:00 a. m., the appellant, Mattie Weaver, and her husband took eighteen live turkeys to the appellees' business establishment, a poultry processing business known as The Copes in Topeka, Kansas. Arrangements

for the processing had previously been made. The appellees agreed to dress and process the turkeys and put them in plastic bags.

After accepting the appellant's turkeys, the appellees gave the appellant and her husband a bill for their services which included charges for the dressing, processing and packaging of the turkeys, as well as a charge for the plastic bags in which the turkeys were to have been packaged by the appellees. The appellees promised to have the appellant's turkeys processed and packaged in the plastic bags by 4:30 or 5:00 p. m., that same day.

At approximately 4:00 p. m., on November 23, 1955, the appellees' employees finished dressing the appellant's turkeys and placed them in appellees' cooling vat which was situated in the rear portion of the appellees' business building in a room called the "killing room." The appellant's husband, who had waited at the appellees' premises all afternoon, then testified as follows:

"Immediately after the female employees finished dressing my turkeys, they left the premises. I then went to the defendants office in the front portion of their building and talked to Mr. Laundon, one of the defendants. I told him that I wanted my birds packaged since that was part of our agreement. The defendant Mr. Laundon said 'well, they were busy and didn't know what they could do about it.' I then said 'I guess I'd have to call my wife and come package them myself then.' Mr. Laundon said 'he didn't know, something would have to be done.' I then telephoned my wife using one of the defendants telephones which was located on one of Mr. Laundon's desks in his office. Walter Laundon, one of the defendants and a girl were present in the same room while I placed this call. I asked this girl to look up my wife's phone number and to dial it for me, which she did. I then told my wife over the telephone 'we would have to package the birds and I would come for her . . .'"

The appellant's husband then drove his automobile to his daughter's home in Topeka, picked up the appellant and returned to the appellees' business premises. The appellant and her husband then entered the appellees' "killing room" through an unlocked door situated in the rear portion of the appellees' business building. The appellant's husband had previously seen other customers enter the appellees' "killing room" through the same door that day.

Only one of the appellees' employees was in the "killing room" at this time. His name was Royce Vaughn and he testified by deposition that all processing and dressing of poultry at the appellees' business building was performed in the "killing room," and that there was an outside entrance into this room for customers to use to bring in poultry for the purpose of having it processed.

He further testified that as a result of killing the poultry there would be large quantities of blood on the floor which was cleaned with a broom and water. The room was washed down with water pressure from a hose, and it was his job to do this cleaning.

Mr. Vaughn then testified:

"When I saw Mrs. Weaver, she asked me if the turkeys were ready and I told her that I didn't think they were as we hadn't had time to get them packed. This conversation occurred between 4:30 and 5:00 P. M. This was the approximate time she was to have called back to pick her order up.

"Q. Well, when she spoke to you, asked about the turkeys, what, then, did you tell her?

"A. To the best of my knowledge, she asked when she could get them, and I told her that I did not know, that I myself did not have time to do it, that I would go up and talk to Tommy, that is the son of the owner.

"Q. Is that T. C. Laundon?

"A. That's right. It was in the next room adjacent to the room—the one we were in, and he could tell her what to do about them, and I took her in to talk to Tommy, but I cannot make a statement, truthfully, as to what transpired at this time, because I don't remember what transpired.

"Q. Did you leave her there with him?

"A. I left her there and returned to this room myself.

"Mrs. Weaver then returned to the killing room and told me she was going to pack the turkeys herself to save me a lot of work and trouble. She then started across the killing room to the opposite wall where a loud speaker was located. *I told her that her coat would get splattered with blood and water if she left it there; I told her 'I am not through cleaning' and I told her the coat would be ruined, and I would appreciate it if she would bring it over and hang it in this closet where I kept my own coat, and that I felt it would be safe there and not messed up.*" (Emphasis added.)

The appellant's husband testified that he went from the "killing room" to the office of the appellees, in the front portion of the building, to get the plastic bags, and that he told Mr. Laundon, one of the appellees who was present in the office, that "we were going to bag the turkeys." He testified that after picking up the plastic bags from the appellees' office, he took them back to the "killing room." He testified:

". . . Inasmuch as I knew it would become pretty sloppy in bagging these turkeys, my wife and I removed our coats. I took my coat to my car . . ."

When the appellant's husband returned from his car to the "killing room" he saw his wife lying on the cement floor of the "killing room."

Concerning the accident Mr. Vaughn testified that at the time he was wearing rubber boots and the appellant was wearing street

shoes, and that the floor of the "killing room," made of concrete, was definitely wet at the time she fell. He testified:

"Q. In taking her, or directing her to the closet, did you have her walk at any particular point, suggest a particular way for her to walk?

"A. Not that I recall. I purposely let her walk next to the wall, where I felt, you know, under the circumstances, the wet floor, she wouldn't be apt to slip."

The appellant testified that Mr. Vaughn:

". . . went into the little closet ahead of me, turned on the light. I hung up my coat, then turned around to the right, and I took one step out of the building [closet] and my feet went sideways and I fell directly upon this hip.

"I had fallen on my left hip and couldn't move . . ."

The appellant was immediately taken to Stormont-Vail Hospital and upon removal of her clothes it was noticed that she had blood on the outside of her skirt and hose although she herself was not bleeding. The appellant testified:

"Q. Do you remember anything about your dress or your hose?

"A. The side where I fell was bloodstained clear to the bottom of it, and my hose was just a mess.

"Q. Torn?

"A. No, they were just stuck to my legs, they were so badly saturated . . ."

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Were you bleeding?

"A. I was not."

Upon interrogation Mr. Vaughn testified that:

". . . blood is a very slippery substance when water has been put on it, especially hot water; and the tank, which had been opened and drained, that comes along that area up there, water comes out of the tank, comes along and comes down to a little drain there in the middle of the floor.

"I had not completely finished washing the floor at the time of the plaintiff's fall . . ."

Mr. Vaughn further testified:

"I can remember dozens of occasions during the period of my employment when I observed customers go across the killing room to the same closet where the plaintiff's fall occurred.

"Q. And for what purpose did they do that?

"A. I have known customers to walk over there and say, 'Well, I want to see them pick this turkey.' Well, I would be killing poultry there, and I have cautioned some of them, from time to time, about the blood, because blood was on the floor down there, and they might fall, but they said they wanted to see a turkey picked or something of that sort, or see them go through the scalder, but, of course, I didn't have the authority to tell them to get out."

There is no evidence in the record to indicate that either of the appellees told the appellant to leave the "killing room" at any time. Nor does the record disclose that the appellant was given a direct warning at any time of the slippery condition of the floor. No signs were posted either prohibiting the customers from entering the "killing room" or warning them of the dangerous condition of the floor.

As a result of the appellant's fall she underwent surgery the following day and was physically unable to return to her work for approximately nine months.

At the conclusion of the appellant's evidence the trial court sustained the appellees' demurrer to the evidence, holding that the appellant was a mere licensee and that the evidence failed to show any negligence on the part of the appellees. By reason of the demurrer the appellant's evidence has heretofore been related most favorably to her.

We shall first consider whether there was sufficient evidence from which a jury could find that the appellant was a business invitee at the time of her fall to the floor on the appellees' business premises.

The parties concede that ordinarily the only duty a business proprietor owes to a mere licensee is the duty to refrain from willfully, intentionally or recklessly injuring him. (*Steinmeyer v. McPherson,* 171 Kan. 275, 232 P. 2d 236.) It is also conceded to be a well-established rule that a business proprietor owes a duty to business invitees to keep the premises in a reasonably safe condition, and to safeguard such invitees by warning them of dangerous places in the premises. (*Bessette v. Ernsting,* 155 Kan. 540, 127 P. 2d 438; *Steinmeyer v. McPherson,* supra; *Little v. Butner,* 186 Kan. 75, 348 P. 2d 1022, and cases cited therein.)

Viewing the appellant's evidence as on demurrer, by applying the well-recognized rules of construction for purposes of demurrer (See, *Bessette v. Ernsting,* supra) to which further reference is unnecessary, we find little difficulty upon the foregoing evidence in concluding there was abundant evidence from which a jury could find the appellant was a business invitee on the premises of the appellees at the time and place where she fell.

In *Thompson v. Beard and Gabelman, Inc.,* 169 Kan. 75, 216 P. 2d 798, this court stated:

". . . The duty of the proprietor of a place of business to his customers does not require him to render safe for their use parts of the building reserved for use only by him and his employees, such as private offices, shipping rooms and warerooms, *unless he expressly or impliedly invites or induces a customer to enter such a reserved part* . . ." (p. 77.) (Emphasis added.)

On the evidence presented by the record the appellees agreed to perform the work of packaging the turkeys for a stated consideration, which was paid. The business was for the economic benefit of the appellees as well as the appellant. (See, *Bessette v. Ernsting,* supra.) The appellant and her husband were led by the acts or conduct of the appellees to believe that the use of the premises for the purpose of packaging their turkeys was in accordance with the design for which the place was adapted and for which they permitted it to be used in mutuality of interest. Under these circumstances the appellant's invitation to use the "killing room" is implied. (See, *De Soto Auto Hotel v. McDonough,* 219 F. 2d 253.)

We hold there was ample evidence from which a jury could find that the appellees expressly or impliedly invited or induced the appellant to enter the "killing room" and that the appellant was a business invitee.

Does the appellant's evidence, as viewed on demurrer, establish negligence on the part of the appellees?

The appellant in her petition alleges that she was injured as a result of the appellees' negligence:

". . . in failing to warn plaintiff of the dangers created by the wet and slippery floor; in failing to keep said premises dry and free from danger; in failing to adequately light said premises so that plaintiff, or any other persons entering said room, could adequately see and avoid said dangers."

The discussion on this point will be confined to whether the appellees owed a duty to the appellant to warn her of the dangers created by the wet and slippery floor in the "killing room."

From the evidence heretofore related it is apparent the appellant fell on a pool of blood and water on the floor of the "killing room" outside the entrance to the cloak room, which had been allowed to remain on the floor by the appellees and their employees. By reason of the appellant's fall she severely injured herself. It is also apparent the appellees and their agents had actual knowledge of the fact that blood was splattered on the floor of the "killing room" and that, even though water had been used to clean the floor, it remained slippery. The employee, Mr. Vaughn, testified he was wearing rubber boots and that he purposely let the appellant "walk

next to the wall, where I felt, you know, under the circumstances, the wet floor, she wouldn't be apt to slip." Mr. Vaughn also testified that "on dozens of previous occasions" other customers had walked across the floor of the "killing room" to the closet where the appellant fell, *and that he had first cautioned some of them that the floor was slick and might cause a fall because of the blood on the floor.*

The court is of the opinion that the question of the appellees' negligence in failing to warn the appellant of the slippery condition of the floor in the "killing room" is one to be determined by the jury upon all the evidence presented. (*Thogmartin v. Koppel,* 145 Kan. 347, 65 P. 2d 571; *Walker v. S. H. Kress & Co.,* 147 Kan. 48, 75 P. 2d 820; *Little v. Butner,* supra; and see, *Bury v. Woolworth Co.,* 129 Kan. 514, 283 Pac. 917.)

Was the appellant guilty of contributory negligence as a matter of law?

It was at the direction of the appellees' employee, Mr. Vaughn, that the appellant walked across the floor of the "killing room" to the closet where she hung her coat. Following his directions she placed her coat in the closet, turned, took one step outside the closet and fell on the dangerously slick floor. Conceding the appellant knew that the floor in the "killing room" was wet and that there was blood on the floor, it does not follow that the appellant was guilty of contributory negligence as a matter of law.

In *Nave v. Hixenbaugh,* 180 Kan. 370, 304 P. 2d 482, the plaintiff brought an action for damages sustained when her skirt ignited while she was standing in front of a stove in the defendant's filling station. In answer to special questions, the jury found that the unsafe condition of the defendant's stove would have been visible to the plaintiff had she looked before backing near it, but that plaintiff exercised reasonable care for her own safety. The defendant contended that the court erred in failing to direct a verdict for the defendant for the reason that the plaintiff was guilty of contributory negligence as a matter of law because she would have seen the dangerous condition had she looked. In denying the defendant's contention it was stated:

"The fact that the unsafe condition of the stove was visible to plaintiff had she looked, is not, in itself, sufficient in this case to make her guilty of negligence as a matter of law. The rule applicable in the instant case was restated in *Wainscott v. Carlson Construction Co.,* 179 Kan. 410, 413, 295 P. 2d 649:

" 'It is not in every instance where one exposes himself to a known danger and injury results that he is denied a right to recover, but only in that class of cases where the danger is so obvious and imminent that a person of ordinary prudence under like circumstances would not subject himself to it. Danger may lurk within every defective condition, and yet may not be of such character that men of ordinary prudence would hesitate to expose themselves thereto. The defect and danger therefrom must be such that knowledge, or imputed knowledge thereof, would cause an ordinarily prudent person to appreciate the risk therefrom. The principle is too well established to require a citation of authorities to support it, that mere knowledge of the danger of doing a certain act without a full appreciation of the risk involved is not sufficient to preclude a plaintiff from recovery, even though there may be added to the knowledge of danger a comprehension of some risk. Mere knowledge of the offending instrumentality does not constitute contributory negligence as a matter of law. (*Louisville Gas Co. v. Fry,* 147 Ky. 754, 145 S. W. 748; *Loney v. Laramie Auto Co.,* 36 Wyo. 339, 255 Pac. 350, 53 A. L. R. 73, 80.)' " (p. 377.)

It is well established in this jurisdiction that the question of a plaintiff's contributory negligence must be submitted to the jury if the facts are such that reasonable minds in the exercise of fair and impartial judgment might reach different conclusions thereon. (*Cane v. Steely,* 173 Kan. 866, 252 P. 2d 909; and *Thompson v. Barnette,* 170 Kan. 384, 227 P. 2d 120.) On the evidence presented by the record herein reasonable minds might reach different conclusions on the question of the appellant's contributory negligence.

In conclusion it is held the trial court erred in sustaining the appellees' demurrer to the appellant's evidence.

The judgment of the lower court is reversed with directions to grant a new trial.

SCHROEDER, J. (dissenting): I respectfully dissent from that portion of the opinion which holds there was evidence from which a jury could find that the appellees were guilty of negligence. In my opinion there was no evidence from which a jury could find that the appellees were negligent.

The only allegation of negligence in the appellant's petition, concerning which the evidence might be considered debatable, is the allegation that the appellees failed to warn the appellant of the dangers created by the wet and slippery floor.

The evidence indicates that the appellant was told that her coat would be splattered with blood and water if she left it in the "killing room," and that the employee in the "killing room" was not through cleaning at the time she entered. This was a normal

condition in the "killing room." This was the place where poultry was killed and blood as a matter of course splattered on the floor. She had taken her turkeys to the appellees for the purpose of having them dressed, and being from a farm near Carbondale where she and her husband raised chickens and turkeys which they sold to stores and individuals, it may be fairly assumed she was fully aware that dressing poultry was a messy affair.

When the appellant was asked what kind of a dress she was wearing, she answered:

"I just had a wash dress on *because I came up there to work.*" (Emphasis added.)

On cross examination the appellant testified:

"When I first entered the defendants killing room, I saw Mr. Vaughn. Mr. Vaughn was, at that time, standing over close to where the vats were with a hose in his hand. *I then saw that the floor of the killing room was damp.*

"Q. Now, when you started to hang up your coat you asked him where you could hang it I believe you said, is that correct?

"A. He said, 'Lady, hang your coat around here in this closet where we hang our coats *so it won't get soiled*.'" (Emphasis added.)

There is no evidence whatever that there were any defects in the floor of the "killing room" on the appellees' premises, nor does the appellant so contend.

In *Steinmeyer v. McPherson,* 171 Kan. 275, 232 P. 2d 236, the court said:

". . . The proprietor of a trade or business is not an absolute insurer of the safety of customers. He is, however, liable for failure to maintain his premises in a reasonably safe condition for the protection of customers *unless they know, or from facts they should know, of the possessor's activities and of the risk involved therein* . . ." (p. 278.) (Emphasis added.)

The proprietor of a store is not an insurer of his customers against injury, *but is chargeable only with such care as is reasonable under the circumstances. (Thompson v. Beard and Gabelman, Inc.,* 169 Kan. 75, 216 P. 2d 798.)

The duty of care owed to business invitees who used the appellees' "killing room" is not equivalent to, or the same as, the duty of care owed to business invitees who enter a grocery store for the purpose of buying groceries as illustrated in *Little v. Butner,* 186 Kan. 75, 348 P. 2d 1022. A case in point is *George v. Ayesh,* 179 Kan. 324, 295 P. 2d 660, where a salesman called on the defendant, a liquor dealer, for the purpose of selling him merchandise. He went into the back room where the liquor was stored and fell, tripping over

a cardboard filler. The trial court sustained a demurrer to the plaintiff's evidence and this court affirmed, saying:

". . . The trouble, from plaintiff's standpoint, is that the evidence here simply does not establish any such hidden dangerous defect as was present in the last-mentioned cases. ·

"In fact, as we read this record, there is a total lack of negligence on the part of defendant and no showing of a violation of any duty. *The responsibility of a merchant or storekeeper varies according to the circumstances.* The mere fact that an invitee slips or falls in a place of business does not necessarily render the owner or proprietor liable in damages. As a practical matter, it seems utterly unreasonable to say that the operator of a liquor store who allows a cardboard filler to remain on the floor of his storeroom in plain view of anyone who takes the trouble to observe, is guilty of negligence for so doing." (pp. 326, 327.) (Emphasis added.)

In my opinion the appellees owed no duty to the appellant to keep their floor in the "killing room" dry and free from blood and water. It was a normal condition to have blood and water on the floor of the "killing room." The appellant knew the floor was wet. She was told by the employee in charge that he had not completed cleaning the floor, and that her coat would become splattered with blood and water if she hung it in the "killing room." Knowing the condition of the room and the purpose for which it was used, any further warning to the appellant by the appellees would have been superfluous. She therefore entered this room at her own risk and the appellees had no further duty to warn the appellant of the condition of the floor in the "killing room."

It is respectfully submitted the trial court did not err in sustaining the appellees' demurrer to the appellant's evidence.

PARKER, C. J., and PRICE, J., join in the foregoing dissenting opinion.